

# NUMBER 13-10-00395-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**VANESSA ZUNIGA,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                      **Appellee.**

## On appeal from the 117th District Court of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Vela
Memorandum Opinion by Justice Rose Vela**

A jury convicted appellant, Vanessa Zuniga,[1] of the first-degree felony offense of causing serious bodily injury to a child by omission, *see* TEX. PENAL CODE ANN. § 22.04(a)(1), (e) (West Supp. 2011), and assessed punishment at forty years'

---

[1] Zuniga was tried together with co-defendants Alma Linda Villarreal and Maria Yolanda Zuniga.

imprisonment. By five issues, appellant asserts: (1) the evidence was insufficient to support her conviction; (2) error occurred in the guilt-innocence charge; (3) she was denied the presence of counsel during closing argument; (4) the Nueces County District Attorney's office should not have prosecuted her case; and (5) the trial court erred by allowing two child witnesses to consult with a guardian while testifying during the State's case-in-chief. We affirm.

## I. FACTUAL BACKGROUND

### A. State's Evidence

This case involves the starvation of three-year-old I.V., who lived with appellant, her girlfriend Alma Linda Villarreal, who is I.V.'s mother, and appellant's mother Maria Yolanda Zuniga. In the afternoon of February 27, 2009, appellant's brother, Jose, arrived at the house where I.V. lived and saw Villarreal crying while appellant's mother called for an ambulance. Rather than wait for an ambulance, Jose rushed I.V. to the emergency room at Spohn Hospital South, where I.V. stopped breathing. Amalia Tinoco, M.D., resuscitated him and discovered his blood sugar measured 3, which is extremely low. After infusing him with glucose, his blood sugar rose to 79, which is within normal limits. Dr. Tinoco testified I.V. was dying and looked severely malnourished and dehydrated. She stated in "a few more minutes his heart would probably have stopped completely . . ." Villarreal, who went to the emergency room with I.V., told Dr. Tinoco I.V. ate a hamburger at 11:00 a.m. that day. However, Dr. Tinoco found it very hard to believe he ate at 11:00 a.m. and by 1:30 p.m., his blood sugar was 3. Dr. Tinoco blamed malnutrition as the cause of his low blood sugar. After treating I.V., she transferred him

2

to Driscoll Children's Hospital.

I.V. arrived at Driscoll Children's Hospital in "serious condition." He had "exposure of every bony prominence", "very visible ribs", and "no body fat." His treating pediatrician, Dr. Rivera,[2] testified I.V. "looked like he was malnourished." Villarreal told Dr. Rivera I.V. was always hungry and always ate a lot but never gained any weight. However, Dr. Rivera testified this was inconsistent with I.V.'s condition and stated that "usually when somebody is always hungry, it usually kind of steers you away from something that is primarily going on with his, stomach or intestinal tract." He said, "[I]f you ingest normal calories or excess calories a child should be thriving." When the prosecutor asked Dr. Rivera, "[W]ere tests performed on [I.V.] to see if there was an organic reason for him being that way?," he said, "Yes, there were numerous tests . . . but all those tests were basically normal."

About 4:00 p.m. on the day he arrived at the hospital, Nancy Harper, M.D., a board-certified specialist in child-abuse pediatrics, examined I.V. She described him as a "frail, frail appearing child, like a skeleton lying on the bed." She stated his "belly was like all scaphoid; it was sunk down and with the degree of starvation, malnutrition I was seeing." When Dr. Harper asked I.V. if he had eaten anything that day or the day before, he said, "No." He told her he was unable to walk or run. She interviewed Villarreal, who told her I.V. had eaten plenty of food. Dr. Harper testified this "history was not consistent with what we saw, . . . . If he had been able to eat that many calories in the days leading up to when he came in, he would not have developed life-threatening refeeding syndrome

---

[2] When the prosecutor called Dr. Rivera as a witness, she did not state Dr. Rivera's first name. Dr. Rivera did not state his first name when he testified.

3

when we started to feed him." She testified he "had extreme starvation from deprivation of food."

Later that day, Villarreal went to the police station and gave a video-taped statement[3] to Detective Tanya Flores. In this statement, Villarreal indicated that on the morning of February 27, 2009, I.V. had eaten three eggs with ketchup, a slice of bread, and a glass of milk.

Belinda Loera, a social worker at Driscoll Children's Hospital, testified that several months earlier on December 1, 2008, she had met with Villarreal and I.V. at the hospital. At that time, Villarreal was concerned because I.V. had lost weight. She explained to Loera she "noticed some changes in his [I.V.'s] eating behaviors going on about ten months." Even though Villarreal told Loera I.V. "hoarded his food," "would eat everything around him," "ate out of the trash can," and "ate more than his older sisters, who were 10 and 12", Villarreal could not identify his favorite food and did not know his feeding schedule or sleeping patterns. Villarreal told her appellant was I.V.'s primary caregiver.

Regarding the events of February 27, 2009, Villarreal told Loera I.V. had breakfast that morning and usually ate three scrambled eggs, ketchup, a slice of toast and a glass of milk. Around eleven or twelve, she passed by I.V.'s room and found him unresponsive, limp, and barely breathing. Villarreal told Loera "she, Vanessa [appellant], and Yolanda [Maria Yolanda Zuniga] were caretakers at that point." Loera testified this "was a change compared to my assessment before." When the prosecutor asked Loera, "So she [Villarreal] said that all three of them took care of him [I.V.] now,

___

[3] During the State's case-in-chief, the trial court admitted the videotape into evidence as State's exhibit 2. The prosecutor played the tape to the jury.

rather than just Vanessa?," she said, "Yes."

I.V.'s sister, A.G.G., testified she lived with I.V. and noticed he was getting "skinny" and "was always laying down." She stated I.V. did not get to eat every day and said appellant was the one who would not let him have food. She stated there were times when appellant would make her eat in front of I.V. and would not let him have any food. Sometimes appellant would deprive him of food for one meal, an entire day, or more than one day. When the prosecutor asked A.G.G. what Villarreal would do when appellant would not let I.V. eat, she said, "She wouldn't be there, or at work, or doing something else downstairs." When asked if Villarreal would feed I.V., she said, "We were the ones that fed him." By "We" she meant herself, her younger sister, A.G., and appellant.

On cross-examination, defense counsel asked A.G.G. about a birthday party which occurred about two weeks before I.V. was rushed to the emergency room. She recalled I.V. attended the party and was "real skinny" and had "real loose skin." She testified he was "always hungry" and "always in his room laying down under the covers." She said Villarreal would go to work early in the morning and return home by lunch time. When defense counsel asked A.G.G., "Do you think that Vanessa [appellant] at any time tried to keep him [I.V.] from having food?," she said, "Sometimes."

I.V.'s other sister, A.G., testified she lived with I.V. and replied, "Yes, I think" when asked if Villarreal knew "that Vanessa wouldn't give [I.V.] food?" A.G. said that when Villarreal "would take Vanessa out, she [Villarreal] would call for my grandma Yoli [Maria Yolanda Zuniga] to give him food." When the prosecutor asked A.G., "But Were [sic] there days that [I.V.] still didn't get to eat in the whole day?," she said, "Yes." According

5

to A.G., Maria Yolanda Zuniga only gave I.V. food when appellant was gone and that appellant "sometimes" got mad when people gave I.V. food.

On cross-examination, when defense counsel asked A.G., "Do you know why he [I.V.] was skinny?," she said, "Because Vanessa [appellant] starved him." A.G. testified that at night, I.V. ate food out of the garbage can.

**B. Defense Evidence**

Appellant's cousin, Rosa Ramirez, visited the home where I.V. lived on numerous occasions. She noticed I.V. was always skinny and could see his ribs. She told Villarreal I.V. looked skinny. Appellant's niece, Samantha, testified she never saw anyone prevent I.V. from eating, and she never saw Villarreal act mean towards him.

Appellant's sister, Lisa Ramirez, testified that when she visited I.V.'s home, she never saw anyone denying I.V. food or liquids. However, she noticed he was "extremely skinny." She stated Villarreal "always worried about why he was so skinny. . . . [A]nd that's why she had took him to the doctor, because he would eat all the time and then his stomach would get real hard."

Appellant's cousin, Jessica Marquez, testified every time she saw I.V. he was eating. She never saw anyone mistreating him but said he was "real skinny."

Appellant's cousin, Sylvia Marquez, testified that when she saw I.V. he was "thin." However, she did not think anything was wrong with him and never saw anyone deny him food or water. She said appellant and Villarreal took responsibility for making sure the kids were dressed and fed.

6

Villarreal's sister, Amy Valdez, testified Villarreal never abused her (Villarreal's) children and never kept them from eating. Rebecca Andrade, who used to baby sit Villarreal's children, testified none of Villarreal's children ever told her they were being abused by anyone. However, she testified I.V. looked "very skinny."

Maria Yolanda Zuniga testified that in December 2008, Villarreal took I.V. to Driscoll Children's Hospital because Villarreal was concerned about him being thin. After his discharge, Villarreal told her, "They said it was just failure to thrive" and "there is nothing wrong with him." She stated Villarreal "told me that they had told her just to follow up in a couple of days." When the prosecutor asked Zuniga, "Did you ever ask [Villarreal], 'Why didn't you take him back, . . . ?,'" Zuniga answered affirmatively and said Villarreal "would say she was going to set up an appointment for him." When asked, "And did she set up an appointment for him?," she said, "I guess not." During January and February 2009, I.V. continued to be very thin, and Zuniga told Villarreal about his condition. Zuniga claimed to have fed I.V. during this two-month period and never saw anyone deny him food. She told the police she, Villarreal, and appellant took charge of taking care of the children and that typically appellant fed them. Zuniga said the last few days before I.V. was taken to Spohn Hospital, "he . . . look[ed] like he is starved." She told Villarreal that "[I.V.] is very skinny. Take him to the doctor."

Appellant testified she never abused I.V. When asked about the events leading up to I.V.'s hospitalization in December 2008, she said, "He [I.V.] started losing too much weight and we were worried about him so she [Villarreal] . . . and my mom took him to the hospital . . . and that's when they told her that he looked like he was starving. . . ." After

7

I.V. was discharged, Villarreal told appellant "he had to come see the doctor again in a couple of days." According to appellant, Villarreal did not bring I.V. back to the doctor as requested. Appellant said she never withheld food from I.V. and stated, "I did not starve [I.V.]. He was always fed either by me, by his mother, by my mother, by friends, . . . . He was not starved."

Villarreal testified she took I.V. to Driscoll Children's Hospital in December 2008 because "I saw he was losing weight." While at Driscoll, I.V. was examined by Dr. Jennifer Davis, who told Villarreal, "Oh, my God. He looks like he is starving." In reply, Villarreal told her, "Yes, he does." She told Dr. Davis that even though "he eats a lot", "he is not gaining no weight, . . . ." Dr. Davis admitted I.V. into the hospital, where he stayed for about four days. Villarreal testified that while I.V. was in the hospital, he was examined by Dr. Flores, who told her I.V. "could be stressing over something. . . . [S]omething in his head, he could be jealous because I had had a baby, because he wasn't the baby no more." When I.V. was discharged, no one gave Villarreal any instructions. She stated that in February 2009, she went to the Spohn Hospital emergency room with I.V. When defense counsel asked her if she "at any time had anything to do with [I.V.] collapsing prior to going to Spohn?," she said, "No" and stated she never told Dr. Tinoco I.V. ate a hamburger the day he arrived at the emergency room. When defense counsel asked her, "Did you intentionally or knowingly keep [I.V.] from receiving nutrition and food?," she said, "No I did not." When asked, "Did you intentionally, knowingly, and by omission not try to seek medical attention for your son?," she said, "No." When asked why she did not call the doctor between the time I.V. was

discharged in December 2008 and taken to the emergency room in February 2009, she said, "[H]e was fine.  He had none of those symptoms.  He was fine.  He was himself. . . .  I did what they told me to do, take him home, do what you've been doing; that's what I did."

On cross-examination, Villarreal testified the reason she did not take I.V. to the doctor on February 26, 2009 (the day before Jose rushed I.V. to the emergency room) was because I.V. "didn't want to go.  He don't like doctors."  She also said, "[H]e was fine."  However, when the prosecutor asked her, "Is that your job as a parent, to do what your children need, regardless of whether or not they like it?," she said, "Yes, it is."

## II. DISCUSSION

### A. Sufficiency of the Evidence

We first address issue five wherein appellant contends the evidence is insufficient[4] to convict her of injury to a child by omission.

#### 1. Standard of Review

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Johnson v. State*, No. PD-0068-11, 2012 WL 931980, at *1 (Tex. Crim. App. Mar. 21, 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).  In *Malik v. State*, the court of criminal appeals articulated the standard for ascertaining what the "essential elements of the crime" are; "they are 'the

---

[4] We point out that the court of criminal appeals has abolished factual-sufficiency review.  *See Howard v. State*, 333 S.W.3d 137, 138 n.2 (Tex. Crim. App. 2011).

9

elements of the offense as defined by the hypothetically correct jury charge for the case.'"

*Johnson*, 2012 WL 931980, at *1 (quoting *Malik*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The hypothetically correct jury charge is one that at least 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240). The court of criminal appeals "described the law 'as authorized by the indictment' to be 'the statutory elements of the offense . . . as modified by the charging instrument[.]'" *Id.* (quoting *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000)).

### 2. Applicable Law

Under the Texas Penal Code, "[a] person commits an offense [of injury to a child] if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, . . . : (1) serious bodily injury[.]" TEX. PENAL CODE ANN. § 22.04(a)(1). A child is a person fourteen years of age or younger. *Id.* § 22.04(c)(1). "An omission that causes a condition described by Subsection (a)(1) . . . is conduct constituting an offense under this section if: . . . (2) the actor has assumed care, custody, or control of a child, . . . ." TEX. PENAL CODE ANN. § 22.04(b)(1). In addition, section 22.04(d) provides:

> For purposes of an omission that causes a condition described by Subsection (a)(1), . . . the actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child, . . . .

*Id.* § 22.04(d).

10

In the instant case, the charge indicated the jury could convict appellant if it found she either intentionally or knowingly by omission caused serious bodily injury to I.V. "by failing to provide adequate nutrition" to him or "by failing to provide adequate medical care" to him. The court of criminal appeals has stated that "'act or omission' constitute[s] the means of committing the course of conduct element of injury to a child." *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). "Injury to a child by omission is a 'result of conduct' offense." *Williams v. State*, 294 S.W.3d 674, 684 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985)). "This means that the culpable mental state relates not to the nature or circumstances surrounding the charged conduct, but to the *result* of that conduct." *Id.* (citing *Thompson v. State*, 227 S.W.3d 153, 159 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)) (emphasis in original). "In other words, the accused must have acted with the requisite culpable mental state to effect the result." *Id.* In *Jefferson*, the court of criminal appeals stated that "the essential element or focus of the statute is the result of the defendant's conduct (in this case, serious bodily injury to a child) and not the possible combinations of conduct that cause the result." *Jefferson*, 189 S.W.3d at 312. Thus, "'act or omission' are not elements of an injury to a child offense about which a jury must be unanimous." *Id.*

"[T]he evidence is sufficient to support [a defendant's] conviction for injury to a child by omission under section 22.04(a) of the penal code if the State proves *either* that [a defendant] intended to cause the injury through his omission or that he was aware that his omission was reasonably certain to cause the injury." *Johnson v. State*, 150 S.W.3d

11

630, 636 (Tex. App.—Austin 2004, no pet.) (emphasis in original). "A person acts intentionally, or with intent, with respect to the . . . result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). The jury may infer both knowledge and intent from any facts that tend to prove the existence of these mental states, including the defendant's acts, words, or conduct, and from the nature of the injury inflicted on the victim. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

### 3. Analysis

### a. Did Appellant Assume Care, Custody, or Control of I.V.?

Loera testified that when I.V. was admitted into Driscoll Children's Hospital in December 2008, appellant was I.V.'s primary caregiver. With respect to the events of February 27, 2009, Loera testified Villarreal, appellant, and Zuniga were I.V.'s caretakers at that point. Other testimony showed (1) appellant lived in the same home with I.V., (2) took care of him when Villarreal was not there, and (3) would provide food to I.V. as well as deprive him of it. Thus, appellant has by act, words, or course of conduct acted so as to cause a reasonable person to conclude she has accepted responsibility for protection, food, shelter, and medical care for I.V. *See* TEX. PENAL CODE ANN. § 22.04(d). Accordingly, we hold that a rational trier of fact could have concluded beyond a reasonable doubt that appellant had assumed care, custody, or control of I.V.

12

**b. Serious Bodily Injury**

"'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, . . . ." TEX. PENAL CODE ANN. § 1.07(a)(46) (West 2011). When I.V. arrived at Spohn Hospital South emergency room on February 27, 2009, he had stopped breathing, and his blood sugar measured 3, which is very low. Dr. Tinoco blamed malnutrition as the cause of his low blood sugar. She testified I.V. was dying and looked severely malnourished and dehydrated. She stated in "a few more minutes his heart would probably have stopped completely, . . . ." Dr. Rivera testified I.V. "looked like he was malnourished" and stated that all the other tests performed on him "were basically normal." Dr. Harper described I.V. as a "frail, frail appearing child, like a skeleton lying on the bed." She testified he "had extreme starvation from deprivation of food." We hold that a rational trier of fact could have concluded beyond a reasonable doubt that I.V. suffered serious bodily injury because of malnourishment. We further hold that a rational trier of fact could have concluded beyond a reasonable doubt that appellant was aware that denial of food to a young child like I.V. was reasonably certain to cause serious bodily injury.

**c. Failure to Provide Adequate Nutrition**

Appellant testified she never abused I.V. and said she never withheld food from him. She testified, "I did not starve [I.V.]. He was always fed either by me, by his mother, by my mother, by friends, . . . . He was not starved." Other witnesses testified appellant neither mistreated I.V. nor denied him food. I.V.'s sisters, who lived with him, stated in their video-taped statements that appellant was nice to all of the children, that

13

she did not hurt anyone, and that she did not treat I.V. differently.

However, this testimony was contradicted by the medical evidence. Furthermore, not only was appellant's evidence at odds with the medical evidence, it was also refuted by the eyewitness testimony of I.V.'s two sisters, A.G.G. and A.G. Both of his sisters testified appellant deprived I.V. of food. The jury was entitled to believe the medical evidence and the trial testimony of I.V.'s sisters. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992) (stating the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony). Moreover, the medical evidence was unrefuted that I.V. nearly died from malnutrition because he did not receive enough food. Because I.V. nearly starved to death while in appellant's care and because there was evidence that appellant deprived him of food, we hold, viewing the evidence in the light most favorable to the verdict, that a rational trier of fact could have found the essential elements of serious bodily injury to a child by omission beyond a reasonable doubt. Therefore, there is legally sufficient evidence to support the jury's verdict that appellant caused serious bodily injury to I.V. by omission. Issue five is overruled.

## B. Charge Error

In issue one, appellant complains of a fatal variance between the indictment and the guilt-innocence charge.

### 1. Preservation of Error

Texas Rule of Appellate Procedure 38.1(i) states the appellate "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Here, appellant's brief contains

14

no citation to any authority that might support an argument that a variance, fatal or otherwise, exists between the indictment and the charge. Therefore, we hold this point of error is inadequately briefed and presents nothing for review as this Court is under no obligation to make appellant's arguments for her. *Lucio v. State*, 351 S.W.3d 878, 396 (Tex. Crim. App. 2011); *see* TEX. R. APP. P. 38.1(i); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008) (affirming that court of criminal appeals has no obligation "to construct and compose" a party's "issues, facts, and arguments with appropriate citations to authorities and to the record") (internal quotes omitted)); *Cardenas v. State*, 30 S.W.3d 384, 393–94 (Tex. Crim. App. 2000) (deciding in a capital case that the defendant's points complaining of the lack of a jury instruction on the voluntariness of the defendant's statements to the police, were inadequately briefed "by neglecting to present argument and authorities" in support of them). Even assuming appellant had not waived this complaint, we conclude she was not egregiously harmed.

### 2. Standard of Review for Charge Error

"[A]n appellate court's first duty in evaluating a jury charge issue is to determine whether error exists. Then, if error is found, the appellate court should analyze that error for harm." *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If, as in the case before us, "no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

15

### 3. The Indictment and the Charge

The State indicted appellant and co-defendant, Maria Yolanda Zuniga, for causing serious bodily injury to a child by omission. Under count one of the indictment, the State alleged that "[o]n or about February 27, 2009, in Nueces County, Texas, [appellant] did then and there intentionally or knowingly by omission cause serious bodily injury to [the victim], a child younger than 15 years of age by either (1) failing to provide adequate nutrition to the child; or (2) failing to provide adequate medical care to the child. The State further alleged that appellant "had a legal duty, to act" and appellant had assumed custody and control of the child. In count two of the indictment, the State made the same allegations against Maria Yolanda Zuniga.

In the jury charge, the trial court stated the following under "Count 2":

> Now, if you find from the evidence beyond a reasonable doubt that on or about February 27, 2009, in Nueces County, Texas, [appellant] did then and there intentionally or knowingly by omission cause serious bodily injury to [the child], a child younger than 15 years of age, by failing to provide adequate nutrition to [the child] and [appellant] had a legal duty, to act, namely, [appellant] had assumed custody and control of [the child],

> **OR**

> Now, if you find from the evidence beyond a reasonable doubt that on or about February 27, 2009, in Nueces County, Texas, [appellant] did then and there intentionally or knowingly by omission cause serious bodily injury to [the child], a child younger than 15 years of age, by failing to provide adequate medical care to [the child] and [appellant] had a legal duty, to act, namely, [appellant] had assumed custody and control of [the child], as alleged in the indictment, then you will find [appellant] guilty of COUNT 2: INJURY TO A CHILD.

> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will next consider the lesser-included second degree offense of COUNT 2: INJURY TO A CHILD.

16

The verdict form attached to the guilt-innocence charge stated: "We the jury find the Defendant, Vanessa Zuniga, *guilty* of the offense of Count 2: Injury to a Child, as alleged in the indictment" (emphasis in original). Thus, the charge designated count two as pertaining to appellant, while the indictment designated count two as pertaining to Maria Yolanda Zuniga. Thus, the charge contains error.

### 4. Harm Analysis

Having determined the trial court erred by submitting an erroneous verdict form, we examine the record to determine whether appellant was egregiously harmed. *See Almanza*, 686 S.W.2d at 171. Any harm that is inflicted by the erroneous charge must be "assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see Ngo v. State*, 175 S.W.3d 738, 750 n.48 (Tex. Crim. App. 2005). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007) (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). We engage in this assessment to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174. In addition, egregious harm is a difficult standard to meet and must be determined on a case-by-case basis. *See Hutch*, 922 S.W.2d at 171.

17

### a. The Entirety of the Charge

The verdict form pertaining to appellant was at variance with the indictment, but the abstract explanation of the law and the application paragraphs were correct. The portion of the charge that applies the law to the facts of the case determines if the charge is fundamentally defective. *Hudson v. State*, 675 S.W.2d 507, 512 (Tex. Crim. App. 1984); *Lewis v. State*, 656 S.W.2d 472, 474 (Tex. Crim. App. 1983). In this case, the application paragraphs correctly applied the law to the facts, instructed the jury on every element of the offense, and informed the jury on the correct burden of proof. Taking into account the charge as a whole, we conclude the erroneous verdict form is a circumstance that does not weigh in favor of a finding of egregious harm.

### b. The Evidence

Whether appellant was guilty of causing serious bodily injury to a child by omission was a contested issue. However, there was sufficient evidence to support the jury's guilty finding. In light of the evidence of appellant's guilt for this offense, there is no indication the jury would have acquitted appellant of this offense had the trial court submitted a correct verdict form. We conclude the trial court's submission of the incorrect verdict form in light of the jury's acceptance of the State's version of events in its finding appellant guilty weighs against a finding of egregious harm.

### c. Arguments of Counsel

In her closing argument, the prosecutor correctly explained the law and what the jury had to find to convict appellant. In addition, the prosecutor did not confuse the jury by arguing that in order to convict appellant, it had to find she committed the allegations

18

found in Count 2 of the indictment. The prosecutor addressed the correct application of the law to the facts. We conclude the arguments of counsel weigh against a finding of egregious harm.

### d. Other Relevant Information

"In addressing other relevant information, we may consider the severity of the punishment assessed, which may indicate egregious harm in some situations." *Martinez v. State*, 313 S.W.3d 358, 369 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *see Bolden v. State*, 73 S.W.3d 428, 432 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Here, appellant was found guilty of causing serious bodily injury to a child by omission, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (e). Appellant received a forty-year sentence, which falls within the lower end of the punishment range for a first-degree felony. *See* TEX. PENAL CODE ANN. § 12.32(a) (West 2011) (stating that "[a]n individual adjudged guilty of a felony of the first degree shall be punished by imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 5 years"). Considering appellant's culpability along with the fact that three-year-old I.V. nearly died as a result of malnutrition, we cannot say the trial court's submission of the erroneous verdict form had any effect on appellant's punishment. Thus, even if the jury had received a correct verdict form, it would likely have reached the same result. We conclude the forty-year sentence, in light of the facts surrounding the offense, weighs against a finding of egregious harm.

**5. No Finding of Egregious Harm**

Based on our reading of the record and the *Almanza* factors, we cannot conclude appellant was denied a fair and impartial trial. We hold that the submission of the erroneous verdict form did not egregiously harm appellant. Issue one is overruled.

## C. Presence of Counsel

In issue two, appellant contends she was denied the constitutional right to presence of counsel, because her trial counsel was absent from the courtroom while the prosecutor made her rebuttal closing argument.

### 1. Background

Prior to the commencement of guilt-innocence closing arguments, the trial judge told the jury appellant's trial counsel "will be leaving the courtroom after his [closing] argument. His wife is undergoing surgery at 12:30. He has my permission to leave and he has requested that an attorney, there's another attorney coming to sit by [appellant] during the rest of the arguments . . ." The reporter's record reflects appellant's trial counsel made his closing argument, but it does not show at what point during closing arguments her trial counsel left the courtroom.

However, at the hearing on appellant's motion for new trial, appellant's trial counsel testified he made his closing argument and then left the courtroom after hearing about ten minutes of the prosecutor's rebuttal closing argument. Trial counsel stated that when he left the courtroom, attorney Bianca Medina sat with appellant in his absence. Before leaving the courtroom, trial counsel conferred with appellant about the fact he had to leave the courtroom because of his wife's surgery. When the prosecutor asked him, "Do

you remember your client [appellant] agreeing to allow you to do that . . . ?", he said, "Yes." When asked, "And do you remember your client agreeing to allow Bianca Medina to sit with her?", he said, "She did."

## 2. Applicable Law and Analysis

"Once the adversarial judicial process has been initiated, the Sixth Amendment[5] right to counsel guarantees an accused the right to have counsel present at all 'critical' stages of the criminal proceeding." *Hughen v. State*, 297 S.W.3d 330, 334 (Tex. Crim. App. 2009) (citing *United States v. Wade*, 388 U.S. 218, 227-28 (1967)). Closing argument is a critical stage of the criminal proceeding. *Herring v. New York*, 422 U.S. 853, 858–59 (1975). In the instant case, appellant had counsel present during the entirety of the closing arguments.

However, this does not end our analysis. The right to counsel requires more than a lawyer's presence; it necessarily requires the right to effective assistance. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); *Powell v. Alabama*, 287 U.S. 45, 57 (1932)). "Both the United States and Texas Constitutions guarantee a criminal defendant the effective assistance of counsel at every stage of trial." *Ex parte Gray*, 126 S.W.3d 565, 568 (Tex. App.—Texarkana 2003, pet. dism'd, untimely filed).

"To prevail on a claim of ineffective assistance of counsel, an "[a]ppellant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense." *Lopez*, 343

---

[5] The Sixth Amendment to the United States Constitution states, in relevant part, that "[i]n all criminal proceedings, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. AMEND. VI.

S.W.3d at 142 (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). In *Jimenez v. State*, the defendant asserted his trial counsel was ineffective because counsel "left the courtroom for a period during final argument." 804 S.W.2d 334, 339 (Tex. App.—San Antonio 1991, pet. ref'd). In overruling this contention, the appellate court stated the defendant did not show "how, in all reasonable probability, the outcome of the trial would have been changed but for this action of his counsel; . . . ." *Id.*

Even assuming trial counsel's performance was deficient because he was absent during most of the prosecutor's rebuttal closing argument, appellant has failed to satisfy the second prong of the *Strickland* test, because she has not shown how her trial counsel's deficient performance prejudiced her defense. *See Strickland*, 466 U.S. at, 688; *Lopez*, 343 S.W.3d at 142; *Jimenez*, 804 S.W.2d at 339. Issue two is overruled.

**D. Withdrawal of Former Trial Counsel**

In issue three, appellant contends her former trial counsel's decision to withdraw as her attorney "and become chief assistant to the prosecutor" who prosecuted this case was improper. At the hearing on appellant's motion for new trial, her trial counsel; i.e., the counsel who tried appellant's case, testified attorney James Lawrence had previously represented appellant in this case. At some point, Lawrence stopped representing her and "became first assistant for the [Nueces County District Attorney's Office], which prosecuted the case against appellant. After Lawrence no longer represented appellant, trial counsel was appointed to represent her. Trial counsel testified Lawrence was "first assistant to Ms. Anna Jimenez . . . who tried . . . [appellant's] case in the courtroom[.]"

22

"As a prerequisite to presenting a complaint on appeal, a party must have made a timely and specific request, objection, or motion to the trial court." *Grant v. State*, 345 S.W.3d 509, 512 (Tex. App.—Waco 2011, pet. ref'd) (citing TEX. R. APP. P. 33.1(a)(1)(A)). In the present case, defense counsel never made a specific request, objection, or motion to the trial court, seeking to disqualify either the Nueces County District Attorney's Office or any of its personnel from prosecuting this case against appellant. In addition, defense counsel made no specific request, objection, or motion to the trial court, apprising it of any conflict or problem that the Nueces County District Attorney's Office might have in prosecuting appellant because of the fact that Lawrence had previously represented her in this case. Thus, appellant has failed to preserve this complaint for appellate review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Grant*, 345 S.W.3d at 512.

Even if this complaint had been preserved, the record does not show that Lawrence in any way helped in appellant's prosecution or that he communicated any information, confidential or otherwise, about the case to any person at the Nueces County District Attorney's Office. Issue three is overruled.

### E. Testimony of Child Witnesses

In issue four, appellant contends the trial court erred when, during cross-examination of two child witnesses, it allowed the children to consult with an adult guardian in the courtroom.

#### 1. Background

During the State's case-in-chief, the prosecutor, outside the jury's presence, told the trial court her next witness would be A.G.G., who is I.V.'s thirteen-year-old sister. In

23

addition, the prosecutor stated, "I would . . . ask that her [A.G.G.'s] court-appointed special advocate [CASA] be allowed to come in while she's testifying, although I may have to call her [the CASA] as a witness and I would ask that you allow that as support for the child."   At that point, appellant's defense counsel stated, "I would object to that" but did not state the grounds for his objection.   The trial court ruled A.G.G.'s CASA could not be present if she might be called as a witness.   Afterwards, during the State's direct-examination of A.G.G., the trial court, outside the jury's presence, told the attorneys for the State and the defense, "I'm going to allow the CASA worker in.   She can sit next to her [A.G.G.] and hold her hand.   She is very distraught so we are going to let—I've got to make her as comfortable as I can to be able to testify, . . . ."   In response, appellant's defense counsel objected that "the testimony has already been that there is 17 months that this child hasn't seen . . . her family. . . .    [I]t's our position that there may have been some influence exerted over this child, and now we're going to have a CASA worker who is testifying on . . . behalf of the State . . . who is going to sit next to her."   To this, the trial court stated, "And you may cross-examine the CASA worker."   The trial court further stated, "I am going to allow her [the CASA worker] to testify.   I have got to make this child as comfortable in this courtroom; otherwise, we're all going to waste our time."   The trial court stated, "I am noting your objection."

After A.G.G. finished testifying, the State called I.V.'s eleven-year-old sister, A.G., to testify.   Appellant does not direct us to any location in the record where defense counsel objected to a CASA worker being in the courtroom when A.G. testified.

24

## 2. Analysis

Appellant argues she "was denied the right to a fair trial when the complainant's young siblings [A.G.G. and A.G.] testified under direction of a CASA worker in the case." Texas Rule of Appellate Procedure 38.1(i) provides the appellate "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Here, appellant has not presented a clear and concise argument with appropriate citations to authority that might support an argument that she was denied a fair trial because A.G.G. and A.G. purportedly testified under the direction of a CASA worker. Therefore, we hold this complaint is inadequately briefed and presents nothing for review as this Court is under no obligation to make appellant's arguments for her. *Lucio*, 351 S.W.3d at 396; *see* TEX. R. APP. P. 38.1(i); *Busby*, 253 S.W.3d at 673; *Cardenas*, 30 S.W.3d at 393–94.

Next, appellant argues the requirements of article 38.071 of the Texas Code of Criminal Procedure were not followed. Article 38.071, entitled "Testimony of child who is victim of offense," sets forth, among other things, the parameters for videotaping a child's testimony and the requirements for the trial court to determine whether a child is "unavailable" to testify in the presence of the defendant about a sexual offense. TEX. CODE CRIM. PROC. ANN. art. 38.071 (West Supp. 2011).

"As a prerequisite to presenting a complaint on appeal, a party must have made a timely and specific request, objection, or motion to the trial court." *Grant*, 345 S.W.3d at 512 (citing TEX. R. APP. P. 33.1(a)(1)(A)). In the present case, defense counsel did not object at trial that the requirements of article 38.071 were not followed. Thus, appellant

25

has failed to preserve this complaint for appellate review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Grant*, 345 S.W.3d at 512.

Lastly, appellant argues "[t]he interactions between these witnesses [A.G.G. and A.G.] and the CASA worker during trial testimony was a violation of the rule . . . against witnesses discussing the case with other witnesses. . . ." However, defense counsel did not urge any objection at trial that the interactions between A.G.G. and A.G. constituted a violation of the rule. Accordingly, this complaint is not preserved for appellate review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Grant*, 345 S.W.3d at 512. Issue four is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
21st day of June, 2012.